## PRUNK and Another *v.* WILLIAMS.

ATTACHMENT—FRAUD.—Complaint by A against B and wife upon a promissory note. An attachment was also sued out against B, upon an affidavit charging that he had disposed of his property, and was disposing of it, with the fraudulent intent to cheat, hinder and delay his creditors. B answered to the attachment by a general denial, and to the complaint that the note sued on was given for a part of the price of a grocery store purchased by him of A; that defendant was ignorant of the value of such property, and procured the services of one C, who was familiar therewith, to counsel and aid him in the purchase; that A, knowing said facts, confederated with C to defraud the defendant, and paid C money to induce him to represent said property to be of a greater value than it really

was; that both A and C fraudulently represented said stock to be worth $5,000, when in fact it was worth only $2,500; that B, being ignorant of said fraud, purchased said stock, and had paid all the price except the sum of $600, sued for herein, &c. The evidence showed that after the purchase, the store was for a time carried on in the name of S and R, the former being a brother-in-law of B, for whose benefit the purchase had been made, and who received a share of the profits, and R being a partner in the purchase at the first. Afterwards, B bought R out, and the business was then carried on, up to the time of the attachment, under the name of S & Co., B being all the while a partner. There was also evidence tending to show that some years before, B, not being then in debt to any one, had purchased some real estate and caused it to be conveyed to his wife, and at the time of the sale of the stock this fact was known to A, who, for better security, caused her name also to be signed to the notes, under the impression that such signature would bind her property. There was no other evidence of any transfer by B of his property.

*Held,* that the evidence did not sustain the attachment.

SAME.—On the trial, the court instructed the jury, 1. That in order to entitle B to any reduction in the contract price, on account of the alleged fraud of C, it must be shown that C, by reason of some promise of A, acted fraudulently in inducing B, through the confidence he had in him, to give a larger price than he would otherwise have done. 2. That if, after the defendant discovered the alleged fraud, he continued to make payments, he cannot recover back the money thus paid.

*Held,* that the instructions were erroneous.


APPEAL from the *Marion* Common Pleas.

GREGORY, J. — *Williams* sued *Daniel H. Prunk* and *Hattie A. Prunk,* his wife, and *Ramsay,* on a promissory note dated *March* 13th, 1866, and also sued out a writ of attachment against *Daniel H. Prunk,* on an affidavit charging that he had disposed of his property subject to execution, and was disposing of his property subject to execution, with the fraudulent intent to cheat, hinder and delay his creditors.

The defendants answered the complaint in three paragraphs:

1. That the consideration of the note sued on was a part of the purchase money of a stock of groceries, fixtures, express wagon, harness, &c, sold by the plaintiff to the defendants; that on, &c., the plaintiff was the owner of a grocery and fixtures on *Illinois* street, in the city of *Indian-.*

*apolis*, and an express wagon and harness used by the plaintiff in the business; and the plaintiff, knowing that the defendants desired to purchase a grocery store in the city, and knowing that they had applied to *Horn*, as a friend, to assist and advise with them in the purchase, and designing to defraud and cheat the defendants, proposed to sell to them his grocery store, fixtures, express wagon, harness, &c.; and in order more effectually to carry out his fraudulent design to wrong and cheat the defendants, he confederated with *Horn*, and procured him to represent to the defendants that the stock of groceries, including the wagon and harness, was worth $5,000; the plaintiff well knowing that the defendants knew nothing of the value of the stock, and that they were relying on the judgment and experience of *Horn*, as their friend, in procuring for them a good grocery store upon advantageous terms; and, for the purpose of cheating and defrauding the defendants, plaintiff induced and procured *Horn* to advise the defendants to purchase his, the plaintiff's, stock of groceries, wagon and harness at $5,000; that *Horn*, at the instance and request of the plaintiff, induced the defendants to believe that he, *Horn*, was their friend, and having thus obtained their confidence and put them off their guard, *Horn*, at the instigation of the plaintiff, advised and assured the defendants that the stock of groceries, wagon and harness were worth $5,000, while, at the same time, *Horn* was acting for the benefit of the plaintiff, and was, at his instance, misrepresenting to the defendants the real value of the property, and received from the plaintiff the sum of $500 for his services, all of which was concealed from the defendants, for the purpose of cheating them in the purchase; that the plaintiff, well knowing that the defendants were inexperienced in judging of the value of a promiscuous stock of groceries, and designing to cheat and defraud them in the sale of his grocery store, &c., represented to them that his stock of groceries and fixtures, including his wagon and harness, were worth, and would invoice, at cost prices, an

amount over $5,000, but when asked to invoice the same he refused, assigning as a reason that the stock had a short time before been invoiced and appraised, and that he knew, from the previous appraisement, and from the amount that had been since added to the stock, that it was worth, including fixtures, wagon and harness, over $5,000, all of which representations were false; that the defendants were induced by the plaintiff to believe said statements; and, further to induce the defendants to enter into the contract with the plaintiff, the latter represented to the former that he was doing an annual business amounting to $60,000, which was false. Whereupon the defendants purchased the stock of groceries, including the fixtures, wagon and harness, and paid the plaintiff thereon $2,000, and executed to him their notes, as follows: one for $1,000, payable in sixty days, one for a like sum, payable in ninety days, and one for $900, payable in one hundred and twenty days; that all of the notes have been paid, except a balance of about $650 on the last note, which is the note sued on; that the stock of groceries, fixtures, wagon and harness, instead of being worth $5,000, as represented by the plaintiff, were not worth at the time to exceed $2,500, which was well known to the plaintiff and to *Horn*, and was concealed from the defendants; that as soon as they, the defendants, fully discovered the extent of the fraud, and the means by which it could be established, they refused, and still refuse, to pay any more on the note. Wherefore they say, that by reason of the fraud, covin and deceit practiced upon them by the plaintiff, in the sale of the stock of groceries, fixtures, &c., for which the notes were given, they were damaged in the sum of $2,500; and they offer to set off against the amount unpaid on the notes an amount equal thereto, and they claim judgment for the balance.

2. The same as the first, except in its conclusion, which is as follows: " Hence, they say that the note sued on was obtained from the defendants through the fraud, covin and deceit of the plaintiff, and is without any consideration

whatever, and they claim judgment against the plaintiff for the amount of money paid to him, through his fraud, over and above the real value of the property."

3. That the note sued on was executed and delivered without any consideration whatever.

The defendant *Daniel H. Prunk* answered the attachment as follows: " That he admits the execution of the note referred to in said affidavit, but denies any indebtedness thereon; and he expressly denies that he, at any time prior to the making of the affidavit by the plaintiff, had disposed of any of his property, or that he was then disposing of his property, or ever has since done so, with the fraudulent intent to cheat or delay his creditors."

The plaintiff replied to the second and third paragraphs of the answer to the complaint by the general denial.

Trial by jury; finding for the plaintiff, including the issue on the attachment; motion for a new trial overruled, and judgment for the amount found by the jury, and for a sale of the property attached. It is proper to say that there was no judgment against Mrs. *Prunk*. A bill of exceptions contains the evidence. There is a conflict in the testimony on the merits. There is evidence tending to establish the defense to the action. So far as the attachment is concerned there is no conflict. The appellant, *Prunk*, is a practicing physician. His object in the purchase of the stock of groceries was to put in business his brother-in-law, *Frank E. Smith*, who had no capital, but had some experience in trade. The capital was furnished by *Prunk* and *Ramsey*. *Smith* got a share of the profits for his services. The business was at first conducted under the firm name of "*Smith & Ramsey*," *Prunk* being a partner. After the lapse of some months, *Prunk* bought out *Ramsey*, and then the business was conducted under the name of "*F. E. Smith & Co.*" *Prunk* remained a partner in the business from the time of the purchase. He never parted with any portion of his interest in the stock, but purchased that of *Ramsey*. *Prunk*, in 1863, and in 1865, purchased some real estate,

worth some five or six thousand dollars, and took the con-
veyances to his wife. He was not at the time indebted to
any one. He was connected with the *United States* army,
and sent the money home to his wife, to be invested in real
estate in her name. *Williams* knew, when he sold his stock
of groceries to *Prunk* and *Ramsey*, that the real estate was
in the name of *Prunk's* wife, and for this reason he had her
to sign the notes. There is nothing in this evidence which
tends to sustain the proceedings in attachment.

At the request of the plaintiff, the court charged the jury
that "if it appears from the evidence that all of the real
estate which the defendant *Prunk* owned had been pre-
viously conveyed to his wife, and that all the remaining
property of *Prunk* was the store he had bought of *Williams*,
and that immediately after the purchase of the store he
caused it to be put in the name of his brother-in-law, *Smith*,
and continued, up to the time of the attachment, to keep
it in *Smith's* name, these are circumstances which the jury
may consider in determining the question whether *Prunk*
made a transfer of his property for the purpose of defraud-
ing his creditors.

"If *Prunk* did, before the suing out of the attachment, dis-
pose of or transfer his property, or any part thereof, subject
to execution, or procure it to be put in the name of another
person, with the intent to cheat, hinder or delay his credi-
tors, you will find for the plaintiff, upon the issue made upon
the attachment. If the intent was only to hinder or em-
barrass, it is enough, though there may not have been any
intent ultimately to avoid or defeat the collection of the
note.

"A man is presumed to contemplate the natural, ordinary
and reasonable results of his acts, and in this case before
you, the defendant *Prunk* must be held to this rule. His
statement, under oath, that he did not intend any fraud, is
to be judged in connection with his acts."

A bill of exceptions informs us that "to the giving of

these charges the defendant, by counsel, at the time objected and excepted."

The defendants, at the proper time, asked the court to charge the jury, that "if the defendant *Prunk*, in good faith, procured his wife to sign the note sued on, as his surety, which was accepted by the plaintiff, the fact that she is not in law liable on the note, is not evidence of fraud on the part of the defendants." The court refused so to charge, and the defendants excepted."

*Prunk* had the right to invest money in real estate in his wife's name, at a time when he was free from debt. And how such an act could be legally set down to his discredit, is difficult to conceive. The instructions of the court were calculated to, and doubtless, did mislead the jury.

The fact that the business was done in the firm name of "*Smith & Ramsey*," and after *Ramsey* sold out in the name of "*F. E. Smith & Co.*, did not tend to show either a fraudulent sale or transfer of any portion of the stock by *Prunk*. *Williams* knew, from the beginning of the transaction, that *Smith* was connected with the purchase; a part of the negotiations were conducted by him.

The jury ought to have been plainly told that the purchases of the real estate in 1863 and in 1865, in the wife's name, should not be considered in determining the issue in the attachment proceeding. The instruction asked ought to have been given.

The jury, on the motion of the plaintiff, were instructed that "in relation to any right growing out of the conduct of *Horn*, it must, to entitle the defendants to any reduction in the contract price, have been shown to your satisfaction that *Horn*, by reason of some promise of *Williams*, acted fraudulently, by inducing the defendants to give a larger sum for the things bought than they would otherwise have done, and that it was done through the confidence they reposed in him.

Also that "if, after the sale was made, the defendants pro-

fess soon to have discovered that false representations had been made to them, touching the amount of the stock of groceries, or that a deceit had been practiced by a serreptitious employment of *Horn* by the plaintiff, and notwithstanding this continued afterwards to make payments, they cannot recover any of the money thus paid, and it is a circumstance which you may consider as tending to repel the idea that any fraud had been practiced;" to which the defendants objected and excepted.

The giving of these instructions is one of the grounds assigned for a new trial.    We think the instructions are erroneous.

It was not necessary that *Horn's* acts should have been the result of "some promise of *Williams.*"    If *Williams,* knowing that there existed a confidential relation between *Prunk* and *Horn,* sought in any manner to use that relation for his benefit, and for that purpose fraudulently confederated with *Horn,* then *Williams* would be chargeable with the fraudulent acts of the former, done in furtherance of the common purpose.

The payment of money after the discovery of the fraud, will not prevent its being recovered back.    Such payment may, under some circumstances, be considered by the jury on the question of fraud.    An action will lie for the deceit. A trader may, to save his credit, elect to pay the purchase money and resort to his action for the deceit.    It is competent for the defendant to show under what circumstances the money was paid.

The first paragraph of the answer was not replied to. The defendants made this one of the grounds of their motion for a new trial; they also moved for a judgment notwithstanding the verdict, and in arrest of judgment.

The first and second paragraphs of the answer are substantially the same.    The defendants can take no benefit resulting from such a repetition in pleading.    In this there was no harm to the defendants.    They had the benefit of their defense under the issues as made.    The court below

erred, however, in overruling the motion for a new trial, for the reasons given in this opinion.

The judgment is reversed, with costs, and the cause remanded, with directions to grant a new trial, and for further proceedings.

*W. Morrow, R. M. Goodwin* and *W. H. Hay,* for appellants.

*A. G. Porter, B. Harrison* and *W. P. Fishback,* for appellee.